IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

PETERSON V. PETERSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

DAVID PETERSON, APPELLANT,

V.

KATHLEEN PETERSON, APPELLEE.

Filed November 13, 2018.    No. A-17-976.

Appeal from the District Court for Douglas County: TIMOTHY P. BURNS, Judge. Affirmed as modified.

Andrea Finegan McChesney, of McChesney & Farrell Law Offices, for appellant.

Tim J. Kielty for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

MOORE, Chief Judge.

INTRODUCTION

David Peterson appeals from the order of the district court for Douglas County which dissolved his marriage to Kathleen Peterson. David assigns error to the award of child custody, the court's calculation of his income for purposes of child support, a credit for premarital funds to Kathleen, and the awards of alimony and attorney fees. The court did not abuse its discretion with respect to these issues; however, we find plain error in the court's calculation of Kathleen's income for purposes of child support. Accordingly, we affirm as modified.

BACKGROUND

David and Kathleen were married on August 18, 2007. Three children were born to them during the marriage, in 2009, 2011, and 2013, respectively. David and Kathleen separated in October 2015.

- 1 -

On January 5, 2016, David filed a complaint for dissolution of marriage in the district court. He asked the court to dissolve the parties' marriage, equitably divide the marital estate, award joint legal and physical custody of the children to the parties, and award temporary and permanent child support and attorney fees. On January 13, he filed a motion for temporary allowances, seeking temporary joint legal and physical custody, temporary child support, and exclusive possession of the marital residence.

Kathleen filed an answer and counterclaim, asking for sole legal and physical custody of the children, subject to reasonable parenting time by David, and for temporary and permanent child support and alimony. She also asked the district court to exclude David from the marital residence, pending further order of the court, and dissolve the parties' marriage, equitably divide the marital estate, and award her reasonable attorney fees. Kathleen thereafter filed a motion for temporary allowances, including custody, child support, alimony, and attorney fees, and she again asked the court to exclude David from the marital residence.

On February 24, 2016, the district court entered an order for temporary allowances. It awarded the parties joint temporary legal custody and Kathleen temporary physical custody, subject to reasonable parenting time by David. The court awarded David temporary parenting time every Thursday from 4:30 p.m. until 7 p.m. and every other weekend starting Friday at 4:30 p.m. and ending when the children were delivered either to school or to Kathleen's residence on Monday morning. The court ordered David to pay temporary child support of $2,720 per month and alimony of $1,500 per month, commencing February 1. The court also ordered David to pay Kathleen $2,500 for attorney fees, and it awarded Kathleen temporary exclusive possession of the marital residence and responsibility for all costs associated with its upkeep.

Trial was held on February 16, April 27, and July 12, 2017. The court heard testimony from witnesses including David, Kathleen, and the president of the company where David is employed. The court also received various documentary exhibits, which we discuss as necessary to resolution of David's appeal.

At the time of the parties' marriage, Kathleen was working full time as a nurse, which she continued to do while David finished his master's degree. After the birth of their first child, the parties agreed that Kathleen would work part time. The parties' children have never been in out-of-home daycare, and according to Kathleen, not using a daycare facility was also a point upon which the parties agreed. Kathleen testified that when she began working part time, she "lost out on money in [her] 401(k)," as well as promotions and raises. From after the birth of the youngest child up to the time of trial, Kathleen worked on a "PRN" or "on call" basis, working only two shifts of 12 hours per month, earning an average of $888 per month. Under this schedule, she is not entitled to any benefits such as health insurance. Kathleen wants to work part time until the youngest child starts kindergarten in August 2018. Kathleen agreed that she would earn $4,024 per month if working full time. On the third day of trial, Kathleen was asked whether she had "checked into full-time employment." In response, she testified that she had applied for some jobs, but had not yet had any interviews.

David is employed at Miller Electric as a senior electrical project manager. He has a bachelor's degree in math, physics, and architectural engineering, and during the marriage, he completed a master's degree in architectural engineering. David's normal work hours are from 7:30 a.m. to 5 p.m., but he testified that his schedule is flexible, allowing him to pick the children

up at 4:30 p.m. on his parenting time days. He is paid a salary, and his paycheck is about $2,300 every 2 weeks. In addition to his salary, David received a bonus of $30,000 in 2014 and of $25,000 in 2015. At the time of trial, however, David was no longer eligible for bonuses; the president of the company explained that shareholders with over 2 percent of shares in the company do not receive bonuses.

There was considerable evidence presented about stocks in Miller Electric that David purchased during the marriage and the dividends paid on that stock. David agreed at trial that the stocks are intended as "a glorified retirement account," although we note that David also has a separate 401(k) account available through the company. Only employees of the company can actually own the stock, and if an employee leaves the company, the employee is required to sell it back to the company at the present stock value. The board of directors determines how much stock is offered each year, and stock is offered to eligible employees based on performance. David has purchased whatever amount of stock was offered each year since he became eligible to do so in 2011. David purchased the following amounts of stock during the marriage: 10 shares in 2011 at a cost of $1,993 per share; 15 shares in 2012 at a cost of $1,995 per share; 20 shares in 2013 at a cost of $2,122 per share; 25 shares in 2014 at a cost of $2,257 per share; and 30 shares in 2015 at a cost of $2,386 per share. David purchased 35 shares in 2016 after the parties' separation, and he was offered 15 additional shares in 2017.

The purchase price of the stock must be paid at the time of the purchase. In order to purchase stock, David takes out a loan, using the stock as collateral. David testified that the loan is due at the end of the year and must either be paid back at that time or refinanced. He testified that he pays the loan back using the dividends he receives from Miller Electric, and if there is remaining debt, he asks the bank to refinance the loan. David testified that the balance of the stock purchase loan as of the parties' date of separation was $83,211. David has refinanced the loan for additional stock purchases made since the parties' separation, and on the second day of trial, David estimated the current total balance on the stock loan at around $180,000 or $185,000.

Dividends on the stock are distributed to employees in quarterly payments (in March, June, September, and December) the year after they are earned and taxed. For example, dividends on the stock purchased in 2015 prior to the parties' separation were not distributed until 2016. David receives a K-1 form showing the dividends he is taxed upon for a particular year. The distributions are not divided into equal amounts. Typically, 55 percent is paid in the first distribution with equal payments of 15 percent each in the remaining quarters. The amount of dividend per share is based on the company's net profits; it is a Subchapter S corporation, so all profits have to be paid out to shareholders. The record reflects that the dividend amount per share was $1,024 in 2011, $1,235 in 2012, $2,495 in 2013, $1,522 in 2014, and $1,607 in 2015. The president of Miller Electric anticipated that the dividend amount for 2016 would be around $800 per share.

The parties' most recent income tax returns were received into evidence. In 2014 and 2015, the parties filed joint income tax returns. The 2014 return shows that David had wages of $98,103 and total S corporation income of $108,859. Kathleen had wages of $9,918. The 2015 return shows that David had wages of $114,588 and total S corporation income of $168,555. Kathleen had wages of $8,781. In 2016, David filed as "[m]arried filing separately." David's 2016 tax return shows that he had wages of $96,200 and total S corporation income of $112,704. Kathleen's 2016 tax return is not in the record.

While we do not set forth the evidence in detail here, we note that Kathleen questioned David extensively at trial, attempting to support her assertion that he had hidden marital funds amounting to nearly $160,000. In response, David testified that all funds from his salary and dividends were deposited into joint marital accounts. David denied having an undisclosed $160,000 in marital funds.

There was evidence about the parties' interactions with and involvement in the children's lives. Kathleen testified that she has been the children's primary caregiver. She registers the children for school and most of their extracurricular activities, volunteers at school activities, coaches a soccer team for one child, schedules medical checkups, takes the children to doctor appointments, and plans birthday parties and activities with the children's friends. Although David did not know the names of the children's doctors and dentists at the time of his pretrial deposition, he did know the names of the relevant medical and dental offices. David agreed both in his deposition and at trial that Kathleen has been the one to schedule and take the children to these appointments. Kathleen testified that she had offered David extra parenting time on certain holidays, but that David did not always utilize the extra time she offered. She also indicated that David had requested extra time only on Labor Day.

Kathleen asked the district court to award her physical custody subject to liberal parenting time with David, testifying that the children had adjusted to the temporary parenting time schedule, that they would not need daycare under her current work schedule, and that she had family and friends who could help her if necessary. She also testified that a custody arrangement that took the children away from her residence more frequently would interrupt their interactions with friends in the neighborhood.

Kathleen expressed only a few concerns about David's parenting time with the children. She testified that he had not had the appropriate car seats on at least one occasion when he picked up the children. She also noted that the parties' youngest child "got lost in an elevator" once while on vacation with David in Washington, D.C. and "a stranger" had to bring the child "to the front desk." David explained that the children had run ahead "to see who could push the [elevator] button first," that one of the children got on the elevator as soon as the doors opened, and that the doors closed before anyone else got on. By "talk[ing] between floors" to "the person below," David was able to communicate that he would meet that individual in the hotel lobby to retrieve the child.

Kathleen also testified to her belief that David prioritized himself and his female friend over the children. Kathleen did not know much about David's friend, and she expressed concern about whether David would be taking the children with him during his frequent visits to this friend in Kansas. David was questioned about credit card documentation, showing charges at locations in Kansas on 180 different days between September 16, 2015, and December 21, 2016. He was asked whether he "get[s] to Kansas that frequent[ly]," and he responded that he is there on a "[f]airly frequent" basis. The district court sustained David's objection on the basis of speculation when he was asked whether he would be taking the children with him "down to . . . Kansas" if he were granted additional parenting time. David did testify that the travel time to visit his friend is about 6 hours roundtrip, and he testified that despite his frequent visits to Kansas, he would still be able to find time for his children.

David testified that prior to the parties' separation, he would spend time with the children after he returned from work and would assist with the children's bedtime routines after dinner. He

- 4 -

testified that the parties have shared in signing the children up for extracurricular activities, and indicated that he has attended at least some medical appointments. David thought that the parties had worked together reasonably well to communicate effectively with respect to the children's "schedules and stuff" and to coparent, and he feels that he fosters the children's relationship with Kathleen. David testified that he has a good relationship with the children and that they enjoy spending time with him. During David's Thursday evening parenting time, he usually prepares a simple meal and plays games with the children, although he sometimes takes them bowling or swimming. David coaches a soccer team for one of the children, and they also spend time riding bikes or playing sports outside. He felt the children had adjusted well to having two homes, and there had not been any associated behavioral issues.

David asked the district court for "share[d] physical custody" of the children, testifying that he felt the parties were both important in the children's lives, and he expressed his wish to have additional time with the children. According to David, since implementation of the temporary parenting schedule, Kathleen has not been agreeable to allowing him more time with the children. David preferred a "9/5 schedule," where he would have parenting time on alternating weekends from Thursday at 4:30 or 5 p.m. until Tuesday morning, with a Thursday overnight on the "off week." David testified that his work schedule would accommodate such a parenting time schedule. David agreed that he works on Fridays and Mondays, and when asked if he would use daycare for the children if he had custody on those days, he testified that he probably would not use a "child care center" but would "figure out a means to take care of them." He testified that he would "[p]ossibly" get a babysitter or "nanny at the house" for the children during those portions of the day when they were not in school but he was still at work.

Kathleen asked the district court to award her alimony and a reasonable sum for attorney fees. The court received an affidavit of attorney fees from Kathleen's attorney. In the affidavit, Kathleen's attorney described some of the difficulties encountered based on David's alleged failure to comply with requests for information. The attorney stated that David had paid the previously ordered amount of $2,500, and he asked the court to order David to pay an additional "fair and reasonable sum" toward Kathleen's attorney fees. The documentation attached to the affidavit reflected the hours and cost of services provided to Kathleen on specified dates throughout the case for a net total of $17,935.20 after subtracting the $2,500 already paid by David.

The parties purchased a residence in June 2007 prior to their marriage. Kathleen contributed $12,722 of her premarital funds toward the downpayment on the purchase. In April 2011, the parties sold the first residence and purchased a second residence. At the time of the parties' separation, the amount of the mortgage against the marital residence was $199,000. The parties submitted appraisals, valuing the marital residence at $302,000 and $306,000.

On July 26, 2017, the district court entered a decree, dissolving the parties' marriage. We discuss only those provisions of the decree relevant to the present appeal.

With respect to custody, the district court found that both parties were fit and proper parents. It observed, however, that Kathleen has been a stay-at-home parent for approximately 5 years and has been the children's primary caregiver. The court also observed that the children have adjusted to the temporary parenting time schedule. The court stated, "Although [David] desires more time with his children . . . the age of the children makes stability and consistency more of a priority, and a joint physical custody arrangement would not at this time be in the best interests of

the children." The court awarded the parties joint legal custody and Kathleen sole physical custody, subject to the parenting time as set forth in the attached parenting plan. The court awarded David parenting time on alternating weekends from Friday at 4:30 p.m. until Monday morning at 8 a.m., every Thursday from 4:30 p.m. until 7 p.m., and "such other visitation as may be agreed to by the parties." The parenting plan also provided that each party was entitled to 2 non-consecutive weeks of vacation parenting time and specified a schedule for holiday parenting time.

For purposes of calculating child support, the district court set David's gross monthly income at $17,409, utilizing his 2016 income tax return which showed that David earned $96,200 in wages and $112,704 in dividends. The court stated, "There is no question [David's] dividend income has fluctuated over the last four years, but the Court finds averaging these amounts would be inequitable under the facts." The court noted that David received "a significant spike" in dividend income of $168,555 in 2015, which the court found to be "a substantial increase" when compared to the dividend income received for the other years from 2013 to 2016. In terms of Kathleen's income, the court found it in the children's best interests to allow her to continue being a stay-at-home parent until the youngest child starts school in August 2018. Accordingly, the court prepared two child support calculations, attributing income to Kathleen of $888 per month until August 2018 and monthly income of $4,024.80 after that date based on her working full time as a nurse. The court ordered David to pay child support of $2,742 per month for three children from the first day of the month after entry of the decree until August 31 and then monthly support of $2,446 beginning September 1. The court ordered David to pay monthly child support of $2,186 for two minor children and of $1,592 when only one minor child remained. The court attached worksheets showing its calculations.

The district court valued the equity in the marital residence at $105,000. The court recognized that Kathleen provided premarital funds in the amount of $12,722 for the downpayment on the parties' first residence and that all of the equity in the first residence was applied toward the purchase of the current residence. The court found that Kathleen was entitled to an offset of $12,722.00, making the "total marital value" of the current residence $92,278. The court awarded the residence to Kathleen and ordered her to refinance the residence in her name only within 6 months of the decree.

The district court awarded David the 100 shares of Millard Electric stock owned by the parties at the end of 2015 valued at $2,386 per share for a total value of $238,600. The court determined that the outstanding balance of $83,211 on the loan to purchase this stock was a marital debt and assigned it to David. Accordingly, the court found that the 100 shares of stock had a "marital value" of $155,339. The court also addressed Kathleen's claim that she was entitled to one-half of the dividend income David received in 2016. The court found that while this income was earned in 2015 but not paid out until 2016, Kathleen was not entitled to one-half because the dividends received by David were income and had been included in the court's child support calculation.

The district court was not persuaded by the evidence Kathleen presented to support her assertion that David had hidden or diverted marital funds since 2011 in the approximate value of $160,000. The court specifically noted David's testimony that all his income from salary and dividends were deposited into joint accounts. The court also noted that Kathleen had not produced any bank records to dispute this testimony.

Finally, the district court ordered the payment of alimony and attorney fees. The court set forth factors relevant to the award of alimony, including Kathleen's interruption of her nursing career to care for the parties' children and the large income disparity that would still exist once she returned to full-time nursing. The court awarded Kathleen alimony in the amount of $2,500 per month for 36 months, commencing on the first day of the month following the decree. The court also ordered David to pay $7,500 in attorney fees to Kathleen's attorney. Elsewhere in the decree, the court inadvertently stated that the amount of attorney fees awarded was $5,000. This error was later corrected through an order nunc pro tunc.

On August 7, 2017, David filed a motion for new trial or in the alternative to alter or amend. He later filed a motion for clarification, findings of fact, and conclusions of law. Following a hearing on David's motions, the district court entered an order denying the motions for new trial and for clarification; however, it amended the decree in several respects. First, the court clarified that Kathleen rather than David was the party entitled to the offset for premarital funds on the value of the marital residence. With respect to child support, the court modified Kathleen's income from that contained in the decree by adding in the alimony award. The court determined Kathleen's income until July 31, 2018, to be $888 plus $2,500 in alimony for a total of $3,380 per month. For this period, David's child support obligation for three children was set at $2,493 per month. After July 31, 2018, until July 31, 2020, the court determined Kathleen's income to be $4,024 based upon her working full time as a nurse, plus $2,500 in alimony for a total of $6,524.80. For this period, David's child support obligation was set at $2,212. After July 31, 2020, when alimony payments were completed, the court calculated Kathleen's income at $4,024.80. The court attached three worksheets reflecting the new calculations. Finally, the court amended the parenting plan to provide that if a holiday would result in Kathleen having 3 consecutive weekends of parenting time, David should then have parenting time the weekend before or after the holiday without the pattern of every-other-weekend parenting time being altered.

## ASSIGNMENTS OF ERROR

David asserts, restated and reordered, that the district court abused its discretion in (1) awarding Kathleen sole physical custody of the parties' minor children despite finding that both parents are fit and proper parents, (2) calculating his income for purposes of child support, (3) awarding Kathleen an offset of premarital funds paid toward the marital residence, (4) calculating both the amount and duration of alimony awarded to Kathleen, and (5) ordering him to pay Kathleen's attorney fees in the amount of $7,500.

## STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Armknecht v. Armknecht*, 300 Neb. 870, 916 N.W.2d 581 (2018). When evidence is in conflict, the appellate court considers and may give

weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

ANALYSIS

*Custody.*

David asserts that the district court abused its discretion in awarding Kathleen sole physical custody of the parties' minor children despite finding that both parents are fit and proper parents. David argues that because the court found both parties to be fit parents, it should have awarded the parties joint physical custody of the children.

When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests. *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Id.* Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
> (c) The general health, welfare, and social behavior of the minor child;
> (d) Credible evidence of abuse inflicted on any family or household member. . . ; and
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

"Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." Neb. Rev. Stat. § 43-2922(12) (Reissue 2016). However, Nebraska statutes do not require the district court to grant equal parenting time or joint custody to the parents if such is not in their children's best interests. See *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009). Neb. Rev. Stat. § 42-364(3) (Reissue 2016) provides:

Custody of a minor child may be placed with both parents on a . . . joint physical custody basis . . . (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody . . . is in the best interests of the minor child regardless of any parental agreement or consent.

Joint physical custody should be reserved for those cases where, in the judgment of the trial court, the parents are of such maturity that the arrangement will not operate to allow the child to manipulate the parents or confuse the child's sense of direction, and will provide a stable atmosphere for the child to adjust, rather than perpetuating turmoil or custodial wars. *Erin W. v. Charissa W.*, 297 Neb. 143, 897 N.W.2d 858 (2017).

In her brief, Kathleen notes the recent case of *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018). In that case, the district court made no explicit finding that either party was unfit, but it noted the parties' history of conflict which the court found would make joint legal and physical custody inappropriate. The court awarded the mother both sole legal and sole physical custody. On appeal, the father complained that the district court should not have placed sole custody with the mother, but this court determined that the lower court's decision was based upon its finding that sole custody with the mother, rather than joint custody, was in the child's best interests.

In this case the district court found that both parties were fit and proper to parent the children. However, the court noted that Kathleen had been the primary caregiver and that the children had adjusted to the custody and parenting time arrangement awarded in the temporary order. The court determined that although David wanted more time with the children, "the age of the children makes stability and consistency more of a priority," also finding that "a joint physical custody arrangement would not at this time be in the best interests of the children." While the record in this case does not show conflict between David and Kathleen, as was present in *Schmeidler v. Schmeidler, supra*, the district court's decision to award Kathleen sole physical custody was based upon the court's finding that such would be in the best interests of the children.

In arguing that the district court should have awarded joint physical custody, David relies on the court's finding that both parents are fit. He also observes that the record does not show any significant concerns with the parties' ability to coparent. However, the parties did not agree to joint physical custody, and the court was not required to award it. The record supports the district court's decision that an award of sole physical custody to Kathleen would be in the children's best interests. Prior to their separation, the parties had agreed that Kathleen should stay at home with the children at least until they started school, and Kathleen testified that they also agreed the children should not be in day care. David now advocates for a custodial arrangement which would change the parties' prior agreements by necessarily requiring significant childcare by persons other than the parties if not actual out-of-home daycare. The record indicates that David has not sought and generally has not taken the additional parenting time offered to him during the temporary period. And, while David is at least aware of which medical and dental offices are utilized for the parties' children, if not the names of the children's doctors and dentists, Kathleen has been the one to arrange those types of appointments. Finally, the record does not clearly show how David's frequent visits to Kansas might fit into any increase in his parenting time.

We also note David's argument that the "nominal parenting time" awarded by the district court was contrary to the children's best interests and should be reversed by this court. David relies upon *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016) in support of his arguments, a case where this court reversed the lower court's award of "limited parenting time" to the father. The issue in that case was whether the lower court abused its discretion in finding that the court-ordered parenting plan was in the child's best interest, and it is inapplicable to our consideration of whether the court in this case abused its discretion in failing to award joint custody.

On appeal, David has taken an all or nothing approach. His assignment of error goes strictly to the court's failure to grant joint physical custody. David does not assign in the alternative that he should have received more parenting time. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). Since David does not specifically assign error to the amount of parenting time awarded by the court, we have limited our consideration to the errors that he both specifically assigned and specifically argued.

Upon our de novo review of the record, we cannot say that the district court abused its discretion in awarding sole physical custody of the parties' children to Kathleen.

*Calculation of David's Income.*

David asserts that the district court abused its discretion in calculating his income for purposes of child support. The court utilized information from David's 2016 income tax return, which showed $96,200 in wages and $112,704 in S corporation income. The court totaled these two income sources and divided by 12 to arrive at a gross monthly income figure for David of $17,409. We find no error in this determination.

The Nebraska Child Support Guidelines define total monthly income as "income of both parties derived from all sources." See Neb. Ct. R. § 4-204 (rev. 2015). The paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Fetherkile v. Fetherkile, supra*.

David argues that that the district court essentially used his gross income in its calculation, and that the court should have taken into account the fact that he is required to take out personal loans to obtain the stock shares for which he receives the dividends. We disagree. First, while the court used a gross monthly income figure for David of $17,409, the child support calculation gave him various appropriate deductions, and arrived at a net monthly income for David of $11,182. Second, both the shares of stock purchased prior to the parties' separation and the debt against the stock were taken into account in the court's division of the marital estate. The shares of stock and the stock loan amount acquired before the parties' separation were properly considered marital assets and marital debt, respectively, and were awarded to David in the decree.

Kathleen responds that if the district court committed any error in calculating David's income, it was favorable to David, and she suggests that the court should have averaged David's income over a 3-year period which would have resulted in a monthly income that was $2,000 greater than that assigned to David by the court. Kathleen has not cross-appealed on this issue, however, and the court specifically found that income averaging "would be inequitable under the facts."

Upon our de novo review and the particular facts of this case, we find no abuse of discretion in the court's calculation of David's income for child support purposes.

*Calculation of Kathleen's Income.*

While the district court did not abuse its discretion in calculating David's income for purposes of child support, we note an issue of plain error in the court's calculation of Kathleen's income in the September 2017 amended order. Accordingly, we modify to adopt the child support calculations set forth in the July 2017 decree.

Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). Plain error may be asserted for the first time on appeal or be noted by an appellate court on its own motion. *Id.*

In the decree, the district court set forth two child support calculations, the first assigning Kathleen income of $888 until August 31, 2018, and the second assigning Kathleen income of $4,024 beginning September 1. This determination was based on Kathleen working part time until the parties' youngest child started school and her working full time as a nurse thereafter. We find no error in this determination, but rather, in the court's inclusion of alimony in Kathleen's income in the calculations the court made in the amended order. In that order, the court performed three calculations based on Kathleen working part time until the youngest child started school, her working full time beginning September 1, 2018, and the conclusion of her receipt of alimony payments from David on July 31, 2020. In the amended order, the court assigned Kathleen income of $3,380 ($888 part-time income plus $2,500 in alimony) until August 31, 2018; income of $6,524.80 ($4,024.80 full-time income plus $2,500 in alimony) from September 1, 2018, until July 31, 2020; and income of $4,024 after the conclusion of David's alimony payments. This was plain error.

As noted above, total monthly income is "income of both parties derived from all sources." See Neb. Ct. R. § 4-204. With respect to alimony, Neb. Ct. R. § 4-213 provides, "These guidelines intend that spousal support be determined from income available to the parties after child support has been established." The Nebraska Supreme Court has previously interpreted § 4-213 to clearly exclude alimony from the parties' total monthly incomes in an initial divorce decree. See *Gallner v. Hoffman*, 264 Neb. 995, 653 N.W.2d 838 (2002). In that case, the Supreme Court stated that because alimony is not properly considered as income when child support is established, the cessation of alimony cannot be considered a diminution in income when determining whether there has been a material change of circumstances justifying a modification of child support. *Id.* See, also, *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018) (holding child support guidelines exclude alimony between parents from total monthly incomes for purpose of calculating child support obligations in modification proceedings); *Roberts v. Roberts*, 25 Neb. App. 192, 903 N.W.2d 267 (2017) (alimony is not item of income in calculating child support).

Because the district court plainly erred in including alimony in Kathleen's income for purposes of child support in the calculations found in the court's amended order of September 2017, we modify that order to adopt, instead, the calculations found in the decree.

*Premarital Offset.*

David asserts that the district court abused its discretion in awarding Kathleen an offset of premarital funds paid toward the marital residence. The court gave Kathleen an offset of $12,722, the amount of premarital funds she contributed as a downpayment against the first residence purchased by the parties. After the parties' sold the first joint residence, they jointly purchased a second residence, and the credit was given against the value of the second jointly purchased residence, which was awarded to Kathleen in the decree.

Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). As a general rule, all property accumulated and acquired by either party during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Westwood v. Darnell*, 299 Neb. 612, 909 N.W.2d 645 (2018). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Marshall v. Marshall, supra.* But if the separate property remains segregated or is traceable into its product, commingling does not occur. *Id.* The burden of proof rests with the party claiming that property is nonmarital. *Id.* In an action for dissolution of marriage, a court may divide property between the parties in accordance with the equities of the situation, irrespective of how legal title is held. *Claborn v. Claborn*, 267 Neb. 201, 673 N.W.2d 533 (2004).

David argues that Kathleen did not "provide any tangible evidence outlining a conclusive amount she provided towards [sic] the down payment of the parties' marital home and that it was not comingled, and in turn, converted into the marital estate." Brief for appellant at 26. He argues further that any funds were "ultimately converted and became part of the marital estate during the parties' marriage." Brief for appellant at 27. We disagree. Kathleen testified that she made a downpayment of over $12,000 of her own money on the first home purchased by the parties. The settlement statement for the parties' loan for that purchase shows that $12,722 cash was received from the borrowers at the time of the loan. David does not argue or point to any evidence showing that the $12,722 came from any source other than Kathleen's premarital funds. After the first residence was sold, the parties purchased the residence which they shared at the time of separation. Because Kathleen's premarital contribution is traceable to the marital residence considered in the district court's division of the marital estate, the court did not abuse its discretion in setting aside as premarital the amount of funds Kathleen contributed toward the downpayment on the parties' first residence.

*Alimony.*

David asserts that the district court abused its discretion in calculating both the amount and duration of alimony awarded to Kathleen. He argues that the court failed to consider Kathleen's employment, her potential opportunities, her advanced degree, and her earning capacity. He also argues that the amount of alimony awarded in the decree is particularly untenable in light of the amount and duration of the temporary alimony award. The court awarded Kathleen temporary alimony of $1,500 per month beginning February 1, 2016. In the decree, the court ordered David

to pay alimony of $2,500 per month for 36 months beginning the first of the month after entry of the decree. The decree was entered on July 27, 2017, and the court's order ruling on the postdecree motions was entered on September 5.

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id.* See, also, Neb. Rev. Stat. § 42-365 (Reissue 2016) (setting forth factors to consider and purpose of alimony award).

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. *Wiedel v. Wiedel, supra.* In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id.* The ultimate criterion is one of reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id.* Alimony is not a tool to equalize the parties' income, but a disparity of income or potential income might partially justify an alimony award. *Id.* The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Id.* Above all else, the duration of an alimony award must be reasonable. *Id.*

In awarding alimony, the district court observed that the parties married in 2007 and that Kathleen had been a stay-at-home parent for about 5 years. The court noted that while Kathleen took care of the children and maintained the household, putting her nursing career on hold, David was able to advance his career. The court noted, however, that Kathleen had maintained her nursing certificates by working the minimal amount of shifts mandated over the last few years and would be able to work full time in her chosen career as a nurse in the future. Finally, the court noted that even when Kathleen returns to full-time nursing, there will still be a large income disparity between the parties.

Our de novo review of the record supports the district court's award of alimony. Kathleen interrupted her full-time nursing career and arranged her very limited part-time work in order to be home and care for the children. This arrangement was by agreement of the parties. Kathleen hopes to return to full-time employment after the parties' youngest child is in school. As recognized by the trial court, a disparity in the parties' income will remain even after Kathleen returns to full-time employment. The court's award of alimony for 36 months following the decree will allow Kathleen time to return to full-time employment. We cannot say that the court's award of alimony was unreasonable or patently unfair. The court considered the appropriate factors, and we find no abuse of discretion either in the amount or duration of the alimony award.

*Attorney Fees.*

David asserts that the district court abused its discretion in ordering him to pay Kathleen's attorney fees in the amount of $7,500. David argues that the district court ordered him to pay too

much of Kathleen's attorney fees, especially when it found that she spent a significant amount of trial time unsuccessfully trying to show that David hid marital income.

In awarding attorney fees in a dissolution action, a court should consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018).

In awarding attorney fees to Kathleen, the court noted that the parties contested custody and parenting time and that the court ruled favorably to Kathleen on those issues. The court further noted that Kathleen spent a significant portion of the trial attempting to prove David hid or diverted marital income, an argument which the court found unpersuasive. Accordingly, the court determined that David should pay for only a portion of Kathleen's attorney fees. Kathleen's attorney provided an affidavit of attorney fees and documentation reflecting the hours and cost of services provided to Kathleen, totaling $17,935.20 after subtracting the $2,500 already paid by David pursuant to the court's earlier attorney fee order. We find no abuse of discretion in the court's determination that David should pay an additional $7,500 of Kathleen's attorney fees.

## CONCLUSION

The district court did not abuse its discretion in awarding sole physical custody of the parties' children to Kathleen, calculating David's income for child support purposes, setting aside the $12,722 in premarital funds Kathleen contributed toward the downpayment on the first residence jointly purchased by the parties, determining the amount or duration of alimony to Kathleen, or in awarding her $7,500 in attorney fees. However, the court committed plain error in its calculation of Kathleen's income for purposes of child support, and we have modified the court's amended order as indicated above.

AFFIRMED AS MODIFIED.